1    JEFFER, MANGELS, BUTLER & MITCHELL LLP
      AN NGUYEN RUDA (SBN 215453) (ahn@jmbm.com)
2    SEAN B. GIBBONS (SBN 263818) (sbg@jmbm.com)
      1900 Avenue of the Stars, Seventh Floor
3    Los Angeles, California  90067-4308
      Telephone:     (310) 203-8080
4    Facsimile:     (310) 203-0567

5    Attorneys for Defendant Ghilotti Bros. Inc.

6

7

8                 UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10

11    JOSE RAMIREZ, LUIS GOMEZ, and       CASE NO.     3:12-cv-04590
      MARCK MENA ORTEGA on behalf of
12    themselves and all other persons similarly    **DECLARATION OF AN NGUYEN RUDA**
      situated,                                    **IN SUPPORT OF DEFENDANT GHILOTTI**
13                                          **BROS., INC.'S OPPOSITION TO**
               Plaintiffs,                   **PLAINTIFFS' MOTION FOR**
14                                          **CONDITIONAL CERTIFICATION OF**
           v.                           **COLLECTIVE ACTION**
15
      GHILOTTI BROS, INC., a corporation;      Judge: Hon. Charles R. Breyer
16    GHILOTTI BROTHERS CONSTRUCTION,   Date: March 29, 2013
      INC., a corporation, and DOES 1 through 50,   Time: 10:00 A.M.
17    inclusive,                               Crtrm: 6, 17th Floor

18               Defendants.

19

20

21

22

23

24

25

26

27

28

PRINTED ON
RECYCLED PAPER

LA 9312269v1

                                           DECLARATION OF AN NGUYEN RUDA

## DECLARATION OF AN NGUYEN RUDA

I, An Nguyen Ruda, do hereby declare and state as follows:

1.    I am an attorney duly licensed to practice law before all courts of the State of California. I am a partner of the law firm of Jeffer Mangels Butler & Mitchell LLP, attorneys of record for Defendant Ghilotti Bros., Inc. ("GBI") in the above-entitled matter. I have personal knowledge of what is stated in this declaration and, if called upon to testify, I could and would testify competently thereto.

2.    On December 11, 2012, I was present and defended Michael Mario Ghilotti in his capacity as Person Most Knowledgeable for GBI, which deposition was transcribed by Mary E. Garland (C.S.R. No. 4721) of Capital Reporting Company. True and correct copies of the transcript of that deposition, specifically pages 17:3-23; 118:2- 119:3; 145:2-17; 146:17-148:9; 167:17-23; and 190:20-193:14, the cover page, and the court reporter's certificate are attached hereto as Exhibit "A."

3.    On December 20, 2012, I conducted the deposition of Plaintiff Jose Ramirez, which deposition was transcribed by Coal Corey (C.S.R. No. 10699) of Atkinson-Baker Court Reporters, Inc. True and correct copies of the transcript of that deposition, specifically pages 37:15- 38:6; and 112:22-113:14, the cover page, and the court reporter's certificate are attached hereto as Exhibit "B."

4.    On December 20, 2012, I conducted the deposition of Plaintiff Marck Mena Ortega, which deposition was transcribed by Ora B. Kohn (C.S.R. No. 11933) of Atkinson-Baker Court Reporters, Inc. True and correct copies of the transcript of that deposition, specifically pages 132:1-133:7; 138:1-7; and 139:16-18, the cover page, and the court reporter's certificate are attached hereto as Exhibit "C."

5.    On December 19, 2012, I conducted the deposition of Plaintiff Luis Gomez, which deposition was transcribed by Ora B. Kohn (C.S.R. No. 11933) of Atkinson-Baker Court Reporters, Inc. True and correct copies of the transcript of that deposition, specifically page 98:1-8, the cover page, and the court reporter's certificate are attached hereto as Exhibit "D."

1         6.     On February 25, 2013, I directed my associate Sean Gibbons to solicit a quote for

2    third-party administration of an "opt-in" collective action using the estimates provided by Plaintiffs'

3    counsel. Mr. Gibbons did so and presented me with a quote from KCC, LLC for two thousand

4    dollars ($2,000.00).  A true and correct copy of the quote provided to me by Mr. Gibbons is

5    attached hereto as Exhibit "E."

6         I declare under penalty of perjury under the laws of the United States of America and the

7    State of California that the foregoing is true and correct and that this Declaration was executed on

8    this, the twenty-sixth day of February, 2013, at Los Angeles, California.

9

10                            By: */s/ An Nguyen Ruda*
                                 AN NGUYEN RUDA

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Capital Reporting Company

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSE RAMIREZ, LUIS GOMEZ, and          No. C-12-4590-CRB
MARCK MENA ORTEGA on behalf
of themselves and all persons
similarly situated,

      Plaintiffs,

  vs.

GHILOTTI BROS., INC., a
corporation; GHILOTTI BROTHERS
CONSTRUCTION, INC., a corporation;
and DOES 1 to 50, inclusive,

      Defendants.
                      /

VIDEOTAPED DEPOSITION OF MICHAEL MARIO GHILOTTI

VOLUME I

DATE:          December 11, 2012

TIME:          9:43 a.m.

LOCATION:      ROSEN BIEN GALVAN & GRUNFELD
               315 Montgomery Street
               Tenth Floor
               San Francisco, California

REPORTED BY:   Mary E. Garland
               Certified Shorthand Reporter
               License Number 4721

2

```
 1                  A P P E A R A N C E S

 2

 3   For the Plaintiffs:

 4         GAY CROSTHWAIT GRUNFELD, ESQ.
           JENNY S. YELIN, ESQ.
 5         ROSEN BIEN GALVAN & GRUNFELD
           315 Montgomery Street
 6         Tenth Floor
           San Francisco, California 94104-1823
 7         (415) 433-6830

 8

 9   For the Defendants:

10         AN NGUYEN RUDA, ESQ.
           JEFFER MANGELS BUTLER & MITCHELL
11         1900 Avenue of the Stars
           Seventh Floor
12         Los Angeles, California 90067-4308
           (310) 203-8080
13

14
     Also Present:
15
           Sean McGrath, Video Technician
16         Stephanie Taylor

17

18

19

20

21

22

23

24

25
```

Capital Reporting Company

17

| | |
|---|---|
| 1  mean Ghilotti Bros., Inc.? | 09:58:15 |
| 2      A.   Yes. | 09:58:16 |
| 3      Q.   According to the first page of this website, | 09:58:17 |
| 4  GBI employs over 275 individuals. | 09:58:19 |
| 5           Is that accurate, or is the LinkedIn 200 or | 09:58:25 |
| 6  less a better number at the present time? | 09:58:30 |
| 7      A.   At the present time, I'm not sure of what | 09:58:34 |
| 8  exactly the number is.  We have seasonal employees; it | 09:58:38 |
| 9  varies from day to day. | 09:58:43 |
| 10      Q.   What's your best estimate of how many | 09:58:45 |
| 11  employees are working for you as of last month, | 09:58:48 |
| 12  November 2012? | 09:58:52 |
| 13      A.   Approximately 200. | 09:58:54 |
| 14      Q.   And when you mention the seasonal employees, | 09:58:59 |
| 15  would that number go up or down in December? | 09:59:04 |
| 16      A.   It would go down. | 09:59:07 |
| 17      Q.   Are you including seasonal employees in the | 09:59:09 |
| 18  estimate of 200? | 09:59:12 |
| 19      A.   Yes. | 09:59:14 |
| 20      Q.   Over the course of the past year, are you able | 09:59:16 |
| 21  to estimate for me the highest number of employees you | 09:59:24 |
| 22  had during 2012? | 09:59:25 |
| 23      A.   I believe that number would be close to 270. | 09:59:27 |
| 24      Q.   What month would that have been most likely to | 09:59:38 |
| 25  have been in? | 09:59:41 |

Capital Reporting Company

```
                                                              118
 1   the payroll department of your company.            01:52:54

 2       A.   And there's probably a different instance for   01:52:57

 3   every job.  There's some jobs where the project     01:53:00

 4   management team is unique to that job, on a heavy   01:53:04

 5   highway job; and the supervisor will take them in to 01:53:07

 6   the trailer, and either he or the project team may  01:53:11

 7   deliver the project documents to the main office.   01:53:15

 8   There might be runners, there might be other employees 01:53:19

 9   that take it from the job site to the office.       01:53:24

10          There's project managers and project engineers 01:53:29

11   that are working out of the main office.  So they may 01:53:33

12   be delivered by the supervisor to them and then they 01:53:36

13   are walked in to operations.  There's no steadfast  01:53:40

14   rule.  It's a coordination issue between the supervisor 01:53:47

15   and the project management team.                     01:53:50

16       Q.   Now, can you tell me, on a given date,     01:53:53

17   approximately how many of these time cards would be  01:53:58

18   submitted to Ms. Wales for processing?              01:54:01

19          MS. RUDA:  Overbroad as to scope and time.   01:54:04

20          THE WITNESS:  On a daily basis, the number   01:54:10

21   could go from zero to 20, maybe 25.                  01:54:12

22   BY MS. GRUNFELD:                                     01:54:18

23       Q.   Because each time card represents a job for 01:54:19

24   that date; is that correct?                          01:54:21

25       A.   And may -- maybe -- there may be two time   01:54:23
```

119

```
1  cards for a job, if there's more equipment, and        01:54:28
2  resources, and manpower that can fit on one time card;  01:54:31
3  but it varies from job to job and activity to activity.  01:54:36
4      Q.  And what hours does Ms. Wales normally work?    01:54:41
5      A.  I believe she's usually -- she's in there -- I   01:54:46
6  think she starts at seven.  She usually works her shift  01:54:57
7  from seven, from Monday through Friday.                 01:55:01
8      Q.  Seven till when?                                01:55:03
9      A.  Well, I think she's -- you know, seven to        01:55:05
10 whatever the eight-hour day is.  I don't -- I don't      01:55:07
11 specifically know her hours.  I know that she's had --   01:55:13
12 again, because of some injuries and some personal time   01:55:16
13 off, and, you know, operations and stuff, she's had --   01:55:19
14 had a challenge --                                       01:55:23
15     Q.  And who does --                                 01:55:24
16     A.  -- with regard to that.                         01:55:25
17     Q.  Yes.  I'm sorry.                                01:55:26
18         Who does she report to?                         01:55:28
19     A.  Dan Chin.                                       01:55:29
20     Q.  Does Dan Chin play any role in the actual       01:55:33
21 entry of the employee time into Timberline, to your     01:55:37
22 knowledge?                                              01:55:46
23     A.  No.  There may be an instance, once in a        01:55:46
24 while, that I think he has had to do the inputting       01:55:50
25 himself possibly.  I don't know for sure.  I know that   01:55:53
```

```
                                                              145
 1   to job sites.                                       02:44:13
 2        A.   So the method is that Ben Barrios starts  02:44:16
 3   contacting supervisors in the morning to go over the 02:44:20
 4   resources that they need for the following day on their 02:44:31
 5   job.  That communication takes place for several hours 02:44:36
 6   in the morning.  And at some point, Ben does his best 02:44:48
 7   to compile a planning worksheet that we have discussed, 02:44:53
 8   basically, in the AVD system, that incorporates those 02:45:02
 9   needs and those resources.                          02:45:07
10        At some point later on in the morning --       02:45:11
11   mid-afternoon, actually, he communicates those requests 02:45:14
12   and does a general summary to a couple of the managers 02:45:22
13   -- most notably, Dominic Nuccio -- and then sometimes 02:45:28
14   communicates to people in charge of the equipment, and 02:45:36
15   goes through that review process, ultimately to arrive 02:45:45
16   at a final product, of which he finalizes and        02:45:50
17   disburses.                                           02:45:56
18        Q.   And that product is the dispatch report that's 02:45:57
19   marked as Exhibit 9?                                 02:45:59
20        A.   One of the products.  The main product is the 02:46:01
21   time card that we have been talking about.  This is a 02:46:05
22   byproduct of it that's used for managers.  It's also 02:46:10
23   consistent with -- this is a summary version.  The time 02:46:16
24   cards are the job-related dispatch.                  02:46:20
25        Q.   Now, when you say that Ben Barrios contacts 02:46:24
```

```
                                                        146
 1  supervisors in the morning, is that contact by      02:46:28

 2  telephone, or e-mail, or both?                       02:46:31

 3     A.  Mostly by telephone.  I don't know that       02:46:33

 4  there's much of any e-mail.  Sometimes on specific   02:46:40

 5  projects, a supervisor may fax in documents, requests 02:46:45

 6  sometimes.                                           02:46:55

 7     Q.  And the communications you described in the   02:46:57

 8  afternoon with Mr. Nuccio, are those by telephone, in 02:46:59

 9  person, or e-mail typically?                         02:47:04

10     A.  They can typically either be by phone or in   02:47:08

11  person.  I don't think there's any e-mail            02:47:11

12  communication.                                       02:47:14

13     Q.  Now, according to Exhibit 9 -- I counted the  02:47:14

14  job numbers that are in the corner.  Such as at the top 02:47:19

15  left, you have "9401."  Do you see that?             02:47:24

16     A.  Yes.                                          02:47:27

17     Q.  So I counted up, and for this particular day, 02:47:28

18  I counted 32 jobs, on November 13th, 2012.           02:47:31

19         And if you want to check that, you could, or  02:47:38

20  we could just say it's approximately 32.  But would  02:47:42

21  that be a typical number of jobs for Ghilotti Bros., to 02:47:46

22  run on a particular day?                             02:47:49

23         MS. RUDA:  It's overbroad.  It's vague and    02:48:24

24  ambiguous as to time.                                02:48:27

25         THE WITNESS:  Well, as best as I can tell,    02:48:56
```

Capital Reporting Company

147

1  there's 19 specific jobs.  There's some jobs that have    02:48:58

2  multiple dispatches.                                       02:49:04

3           With relation to your question about the         02:49:07

4  number of jobs, as we discussed before, it can range      02:49:10

5  from zero to 25 to 30, and varies throughout the year     02:49:15

6  with any -- a number in between.                           02:49:24

7  BY MS. GRUNFELD:                                           02:49:26

8       Q.  Just so you know, I asked for all of these       02:49:27

9  documents to be produced, but this is the only one that   02:49:29

10  was produced to me.  So I need to ask you whether this    02:49:32

11  is typical or not.                                         02:49:36

12      A.  This is, I would say, a higher level of          02:49:37

13  activity than -- than the norm.                           02:49:45

14      Q.  By what percentage?                               02:49:48

15      A.  This would be in the 85 to 90 percent echelon,   02:49:50

16  maybe 95.                                                  02:49:58

17      Q.  And if you count 19 jobs here, does that mean    02:49:59

18  there were 19 supervisors in the field?                   02:50:09

19      A.  No.                                                02:50:11

20      Q.  How do you know how many supervisors are in      02:50:12

21  the field on this date, November 13, 2012?                02:50:15

22      A.  Well, there's a way that you count up the        02:50:22

23  number of supervisors by where their name is reflected   02:50:37

24  in this list.  The fact that a supervisor is out in the  02:50:41

25  field doesn't mean that he's necessarily operating a     02:50:45

Capital Reporting Company

148

| | | |
|---|---|---|
| 1 | job. We have jobs where there's one lead supervisor. | 02:50:48 |
| 2 | And a supervisor can be running equipment | 02:50:50 |
| 3 | because his job is inactive, down because of weather, | 02:50:53 |
| 4 | different issues. So the corresponding number between | 02:50:58 |
| 5 | the number of jobs and the number of supervisors that | 02:51:03 |
| 6 | are active doesn't -- it doesn't correlate. So you -- | 02:51:06 |
| 7 | presumably, the most accurate way is to look through | 02:51:13 |
| 8 | the dispatch and determine by visual inspection how | 02:51:17 |
| 9 | many supervisors are active for that day. | 02:51:23 |
| 10 | Q. And when you say "look through the dispatch," | 02:51:26 |
| 11 | do you mean Exhibit 9? | 02:51:28 |
| 12 | A. Correct. | 02:51:30 |
| 13 | Q. And when I see the name "Randy Davidson" in | 02:51:31 |
| 14 | the first job listed, was he a supervisor on that date? | 02:51:35 |
| 15 | A. I believe so. | 02:51:43 |
| 16 | Q. And if I look to job number 11427, also on the | 02:51:43 |
| 17 | first page, there's two names there, "Kevin Dern" and | 02:51:48 |
| 18 | "James Jaye." Are they both supervisors? | 02:51:52 |
| 19 | A. Kevin is a construction manager. James is a | 02:51:56 |
| 20 | supervisor. | 02:52:04 |
| 21 | Q. And looking below there, you see the name | 02:52:05 |
| 22 | Plaintiff "Mark Ortega;" right? | 02:52:08 |
| 23 | A. Right. | 02:52:10 |
| 24 | Q. And so on this date, Mr. Ortega was assigned | 02:52:12 |
| 25 | to drive flat truck 70; is that correct? | 02:52:14 |

167

1   know, the big cabover trucks -- like I said, five-,          03:27:02

2   seven-axle trucks -- and then transport trucks like we       03:27:07

3   talked about here.  So it's a combination of all             03:27:11

4   different types.                                             03:27:13

5        Q.  But those larger trucks -- the five-, seven-        03:27:14

6   axle, and transport -- would not be driven by the three      03:27:17

7   plaintiffs in this case; is that correct?                    03:27:22

8        A.  Not likely, no.  They -- they are typically         03:27:23

9   restricted to just the teamsters.                            03:27:26

10       Q.  Going back to the list, have we missed any          03:27:31

11   kinds of trucks that Ghilotti Bros., owns currently?        03:27:35

12       A.  I think that's it.                                  03:27:44

13       Q.  On any given end of a shift, are the trucks         03:27:45

14   typically left at the work site, or are they brought        03:27:49

15   back somewhere?                                             03:27:52

16            MS. RUDA:  Overbroad as to time and scope.          03:27:53

17            THE WITNESS:  Again, each specific job has its      03:27:57

18   own relationship.  And it can vary from job to job, and     03:28:00

19   it can vary from day to day.  It depends sometimes on       03:28:09

20   whether or not resources from the yard are needed out       03:28:14

21   on the job, whether or not material was hauled in or        03:28:17

22   disposed of.  These are arrangements that are done          03:28:25

23   between the supervisor and his crew.                        03:28:29

24            Sometimes equipment gets transported into the      03:28:35

25   yard, including trucks, especially if it's got             03:28:38

Capital Reporting Company

190

| | | |
|---|---|---|
| 1 | A.   Yes. | 04:17:07 |
| 2 | Q.   We've been talking quite a bit today about | 04:17:08 |
| 3 | some of these policies and procedures that are | 04:17:15 |
| 4 | reflected in topics 1 through 7 the PMK notice, | 04:17:17 |
| 5 | which is Exhibit 3 to this deposition. | 04:17:22 |
| 6 | I had one additional question about topic 6, | 04:17:29 |
| 7 | which generally involves the assignment of trucks to | 04:17:38 |
| 8 | construction sites, and the times the trucks leave and | 04:17:44 |
| 9 | return to the yards. | 04:17:47 |
| 10 | And that is:  Do the trucks -- is there any | 04:17:49 |
| 11 | system to check the odometers on the trucks to | 04:17:56 |
| 12 | determine how many miles they've been driven on a given | 04:17:59 |
| 13 | workday? | 04:18:04 |
| 14 | A.   No, there's not. | 04:18:05 |
| 15 | Q.   Have you ever discussed with your management | 04:18:07 |
| 16 | team instituting a process of looking at the odometers | 04:18:19 |
| 17 | on a daily basis to determine how far they've been | 04:18:23 |
| 18 | driven? | 04:18:28 |
| 19 | A.   No. | 04:18:28 |
| 20 | Q.   Now, are you aware that the three plaintiffs | 04:18:29 |
| 21 | in this lawsuit are claiming that they are required to | 04:18:32 |
| 22 | go to the yard before the official start time and pick | 04:18:35 |
| 23 | up trucks and drive them, before the official start | 04:18:39 |
| 24 | time of the shift? | 04:18:44 |
| 25 | A.   I'm aware that they are claiming that they | 04:18:49 |

Capital Reporting Company

191

| | | |
|---|---|---|
| 1 | haven't received compensation for the time that they | 04:18:53 |
| 2 | put in to drive the vehicles, is my understanding. | 04:18:55 |
| 3 | Q.  Among other things, yes. | 04:18:58 |
| 4 | And before this lawsuit was filed, did you | 04:19:00 |
| 5 | ever discuss with your management team the claims that | 04:19:04 |
| 6 | plaintiffs are making here, such as whether there | 04:19:08 |
| 7 | should be compensation for the time that an employee | 04:19:11 |
| 8 | goes to the yard to get the truck and drive it to the | 04:19:14 |
| 9 | site? | 04:19:18 |
| 10 | MS. RUDA:  Vague and ambiguous. | 04:19:20 |
| 11 | THE WITNESS:  I'm trying to make sure I have | 04:19:26 |
| 12 | the right timeline.  So if you could repeat the | 04:19:28 |
| 13 | question, it'd help, I guess. | 04:19:31 |
| 14 | BY MS. GRUNFELD: | 04:19:33 |
| 15 | Q.  Sure.  Earlier today we were discussing a | 04:19:33 |
| 16 | memorandum that was sent out by Ms. Taylor in 2007. | 04:19:35 |
| 17 | Obviously, that was prior to this lawsuit being filed. | 04:19:39 |
| 18 | And maybe I'll just start with the memorandum. | 04:19:45 |
| 19 | At the time that memorandum was issued, were | 04:19:48 |
| 20 | you discussing with your management team the issue of | 04:19:51 |
| 21 | compensating employees for that pre-shift driving time? | 04:19:57 |
| 22 | A.  The conversations we had revolving around | 04:20:09 |
| 23 | compensation were mainly with Stephanie Taylor and | 04:20:12 |
| 24 | myself, and possibly Mike Llamas, but did not include, | 04:20:16 |
| 25 | I don't believe, the full management team at all.  It | 04:20:24 |

Capital Reporting Company

192

```
 1   was limited to those two, two people.              04:20:28

 2        Q.  And was there an incident or an issue that  04:20:30

 3   caused you to discuss that issue?                  04:20:33

 4        A.  Well, I think that we came to the realization,  04:20:40

 5   as I mentioned earlier, that our attempt to be uniform  04:20:42

 6   and consistent actually continued an inconsistent  04:20:46

 7   approach, in the sense that we felt that drivers and  04:20:53

 8   supervisors weren't on the same page.              04:21:01

 9            Supervisors were compensating through other  04:21:04

10   methods, possibly for compensation, and that was in  04:21:08

11   addition to the compensation we were trying to provide  04:21:12

12   under that procedure.  So that was the nature of the  04:21:16

13   discussions that we were having.                   04:21:19

14        Q.  And were those back in 2007, when the memo  04:21:21

15   issued?                                            04:21:24

16        A.  After that.                               04:21:25

17        Q.  And I believe you testified earlier you don't  04:21:26

18   recall how long after the date of the memo that you  04:21:29

19   were having those conversations?                   04:21:31

20        A.  Correct.                                  04:21:33

21        Q.  And are you able to tell me what the upshot of  04:21:34

22   those discussions was?                             04:21:38

23            MS. RUDA:  Vague and ambiguous as to "upshot."  04:21:44

24            THE WITNESS:  Yeah, maybe you could be more  04:21:47

25   specific on what you're asking.                    04:21:49
```

Capital Reporting Company

193

| | | |
|---|---|---|
| 1 | BY MS. GRUNFELD: | 04:21:52 |
| 2 | Q. Sure. You testified that that memo went out | 04:21:52 |
| 3 | and that it did not achieve your goal of consistent | 04:21:55 |
| 4 | compensation, and then there were further discussions | 04:21:59 |
| 5 | about it. And what I'm trying to understand is: What | 04:22:02 |
| 6 | was the result of those discussions? | 04:22:06 |
| 7 | A. The result of those discussions was that the | 04:22:08 |
| 8 | system that we believe was in place prior to that, | 04:22:12 |
| 9 | where compensation was organized and accounted for by | 04:22:17 |
| 10 | the individual supervisor, was probably the best system | 04:22:26 |
| 11 | to move forward on. | 04:22:30 |
| 12 | Q. So at that time, you discontinued the driving | 04:22:33 |
| 13 | bonus that the memo talks about? | 04:22:37 |
| 14 | A. Correct. | 04:22:40 |
| 15 | Q. And other than the driving bonus, have there | 04:22:41 |
| 16 | been other attempts in the time period since the date | 04:22:51 |
| 17 | of that memo to address the issue of drivers who are | 04:22:53 |
| 18 | not being paid for time worked before the official | 04:23:00 |
| 19 | start time? | 04:23:03 |
| 20 | A. I think there was a discussion -- | 04:23:04 |
| 21 | MS. RUDA: That misstates the testimony. For | 04:23:06 |
| 22 | clarity of the memos, October 2007. Go ahead. | 04:23:09 |
| 23 | THE WITNESS: I think there was a discussion | 04:23:17 |
| 24 | around the time that we received a letter from an | 04:23:18 |
| 25 | employee that questioned our ability to adequately | 04:23:21 |

CERTIFICATION OF DEPOSITION OFFICER

I, MARY E. GARLAND, duly authorized to administer oaths pursuant to Section 2093(b) of the California Code of Civil Procedure, do hereby certify that the witness in the foregoing deposition was duly sworn by me to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was thereafter transcribed by means of computer-aided transcription under my direction; that the foregoing is a full, complete and true record of said testimony. And that the witness was given an opportunity to read and correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

MARY E. GARLAND, CSR 4721

# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                      ---oOo---

 4


 5    JOSE RAMIREZ, LUIS GOMEZ, and        )
      MARCK MENA ORTEGA, on behalf of      )
 6    themselves and all other persons     )
      similarly situated,                  )
 7                                         )
                 Plaintiffs,               )
 8     vs.                                 )   No.  C 12-04590 JSC
                                           )
 9    GHILOTTI BROS, INC., a corporation;  )
      GHILOTTI BROTHERS CONSTRUCTION,      )
10    INC., a corporation, and DOES        )
      1 through 50, inclusive,             )
11              Defendants.                )
      _____)

12

13

14                     DEPOSITION OF

15                     JOSE RAMIREZ

16               SAN FRANCISCO, CALIFORNIA

17                 December 20, 2012

18

19

20

21    ATKINSON-BAKER, INC.
      COURT REPORTERS
22    www.depo.com
      800-288-3376

23

24    REPORTED BY:   CORAL COREY, CSR NO. 10699

25    FILE NO:  A60B7DD
```

A60B7DD

Jose Ramirez                                          December 20, 2012

37

1          Q.   And what about Romero, to your knowledge does   11:45:15

2     he still work at the company?

3          A.   Yes.  I want to add something.

4          Q.   Sure.

5          A.   I remember now.  I went into the refinery

6     under a false pretense.

7          Q.   Okay.  Let's talk -- okay.  So hold onto that

8     thought.  Okay.  I'm going to write down the words "false

9     pretense" so that I remember to ask you about this, but let

10    me finish my other line of questioning.

11         The times when you did not take lunch breaks, when

12    you worked on Ken Pagan's crew at the refinery, were you

13    paid for that time, to your knowledge?

14         A.   No.

15         Q.   Do you know what a pay discrepancy form is?   11:47:10

16         A.   Yes.

17         Q.   Did you ever submit -- and these paid

18    discrepancy forms you've heard us discuss it in other

19    depositions, correct?

20         A.   Yes.

21         Q.   And these forms, they're received with your

22    paycheck each week, correct?

23         A.   Yes.

24         Q.   Do you know what the purpose of the form is?

25         A.   Yes, because it happens sometimes where they

Atkinson-Baker, Inc.                                   415-421-3021

Jose Ramirez                                          December 20, 2012

38

```
1    did not put down all of the days that had been worked.        11:48:07

2              Q.   And so the purpose of the form was for you to

3    let the company know that there was something short about

4    your paycheck, correct?

5              MS. MUSELL:  Misstates testimony.  You can answer.

6              THE WITNESS:  Yes.

7              MS. RUDA:  Q.  Did you ever submit a payroll

8    discrepancy form to be paid for your missed lunch breaks?

9              A.   No.

10             Q.   Not just when you worked with Ken Pagan but at

11   any time from 2008 forward?

12             A.   Can you repeat the question.

13             Q.   And I'm expanding the question, not just when

14   you worked with Ken Pagan, but at any time from 2008

15   forward, have you ever submitted a payroll discrepancy form  11:50:40

16   to be paid for a missed 30-minute meal break?

17             A.   No.  One time there was a -- that I filled out

18   a form to get paid for some hours that I had not been paid

19   for, and with the supervisor Bob Hanna, I gave him the form

20   and in return -- wait, I actually went to the company

21   because I didn't get paid.  I went to see Frank Palagi.

22             Q.   And we're actually going to talk about that,

23   the time that you submitted the discrepancy form to Bob

24   Hanna and that you had an issue and it was later paid.

25   We're going to talk about that.
```

Atkinson-Baker, Inc.                                  415-421-3021

Jose Ramirez                                          December 20, 2012

                                                              112

1          THE WITNESS:  Yes, but the end of the day the      17:07:32

2    supervisor asked me how much I wanted to be paid, if 10

3    hours or how many.

4          MS. RUDA:  Q.  Okay.

5          A.   And I told him that he was the supervisor, and

6    I didn't know how many hours he was going to pay me.

7          Q.   Did you tell him I want to be paid for 10

8    hours?

9          A.   He told me if I would accept 10 hours, and I

10   answered, I didn't know, because he was the supervisor, and

11   I told him you're the one who has to know how many hours you

12   have to pay me.

13         Q.   Do you think maybe he was asking you because

14   he wanted to know how many hours you had worked?

15         MS. MUSELL:  Objection.  Calls for speculation.     17:08:47

16         THE WITNESS:  No, because we worked the eight

17   hours, and he was referring to the driving.

18         MS. RUDA:  Q.  So is it possible that on 2428 that

19   you were paid for four hours of driving time?  I'm sorry,

20   2483.

21         MS. MUSELL:  Objection.  Calls for speculation.

22         THE WITNESS:  When I left Ukiah, he had suggested

23   he'll pay me 10 hours, and I replied it was for him to pay

24   me whatever he wanted to pay me.

25         And on that day, Bulmaro, he brought in another

Atkinson-Baker, Inc.                                 415-421-3021

A60B7DD

Jose Ramirez                                                    December 20, 2012

113

1    truck, and he told me that he wasn't paid for the four         17:09:48

2    hours.

3           MS. RUDA:  Q.  But you were paid, correct?

4           MS. MUSELL:  Misstates testimony.

5           THE WITNESS:  When I left Ukiah, we agreed on 10

6    hours, he had said.  I didn't accept that.  I left the truck

7    at the yard in San Rafael.  When I was going home in my car

8    on the Richmond Bridge, he called me and told me I'm going

9    to pay you the four hours, because we have worked together

10   before, and he wanted to pay me the four hours.

11          MS. RUDA:  Q.  For your -- for the time, because it

12   took you two hours to drive up and two hours to drive down,

13   correct?

14          A.    Yes.

15          Q.    Who was this?                                     17:11:28

16          A.    Bradley Gary.

17          Q.    Gary Bradley?

18          A.    Gary.  I want to add something as well.

19          Q.    Go ahead.

20          A.    The travel was very long, and some of the

21   workers were not happy going there with their own cars

22   because the gasoline was very expensive.

23          So they decided to use a van that is used for many

24   people, and he assigned me to drive it, but they were not

25   going to pay me for the driving, and I wasn't paid for that.

Atkinson-Baker, Inc.                                            415-421-3021

REPORTER'S CERTIFICATE

1

2

3

4      I, CORAL COREY, CSR No. 10699, Certified

5  Shorthand Reporter, certify;

6      That the foregoing proceedings were taken before

7  me at the time and place therein set forth, at which time

8  the witness was put under oath by me;

9      That the testimony of the witness, the questions

10  propounded, and all objections and statements made at the

11  time of the examination were recorded stenographically by

12  me and were thereafter transcribed;

13      That the foregoing is a true and correct

14  transcript of my shorthand notes so taken.

15      I further certify that I am not a relative or

16  employee of any attorney of the parties, nor financially

17  interested in the action.

18      I declare under penalty of perjury under the laws

19  of California that the foregoing is true and correct.

20  Dated this            JAN                     ,2013.

21

22

23  _____

24      CORAL COREY, C.S.R. No. 10699

25

# EXHIBIT C

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4                        ---o0o---

5

6    JOSE RAMIREZ, LUIS GOMEZ, AND        )
     MARCK MENA ORTEGA ON BEHALF OF       )
7    THEMSELVES AND ALL OTHER PERSONS     )
     SIMILARLY SITUATED                   )
8                                         )
                     Plaintiffs,          )
9                                         )
         vs.                              ) CASE: C12-04590 JSC
10                                        )
     GHILOTTI BROS, INC., A               )
11   CORPORATION; GHILOTTI BROTHERS       )
     CONSTRUCTION, INC., A                )
12   CORPORATION, AND DOES 1 THROUGH      )
     50, INCLUSIVE,                       )
13                                        )
                     Defendants.          )
14                                        )
                                          )
15

16

17      VIDEOTAPED DEPOSITION OF MARCK MENA ORTEGA

18             SAN FRANCISCO, CALIFORNIA

19            FRIDAY, DECEMBER 14, 2012

20

21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   800.288.3376
     WWW.DEPO.COM

23

24   Reported By: Ora B. Kohn, CSR 11933

25   File No. A60B7DC

| | | |
|---|---|---|
| 1 | Q.    From 2008 to 2011, did any supervisor ever let | 16:47:58 |
| 2 | you leave a job site early to return a truck so that | 16:48:04 |
| 3 | you could be back at the yard by 3:30? | 16:48:20 |
| 4 | MS. GRUNFELD:  Objection.  Overbroad. | 16:48:24 |
| 5 | THE WITNESS:  At times. | 16:48:29 |
| 6 | MS. RUDA:  Q.  Can you tell me how many times? | 16:48:30 |
| 7 | A.    Not many. | 16:48:36 |
| 8 | Q.    More than five times? | 16:48:38 |
| 9 | A.    From five to ten times. | 16:48:45 |
| 10 | Q.    Okay. | 16:48:48 |
| 11 | A.    That's what I remember. | 16:48:54 |
| 12 | Q.    Okay.  So from 2008 to 2011, can you recall | 16:48:55 |
| 13 | times when a foreman has let you leave a job site early | 16:49:01 |
| 14 | because you picked up a truck in the morning? | 16:49:07 |
| 15 | MS. GRUNFELD:  Objection.  Asked and answered. | 16:49:21 |
| 16 | MS. RUDA:  Q.  The last question was because | 16:49:24 |
| 17 | you were returning a truck.  This question is because | 16:49:25 |
| 18 | you picked up a truck. | 16:49:33 |
| 19 | A.    What was the question? | 16:49:44 |
| 20 | Q.    So the question is; between 2008 to the | 16:49:45 |
| 21 | present, has any foreman let you leave the job site | 16:49:50 |
| 22 | early because you had picked up a truck in the morning | 16:49:57 |
| 23 | from the -- from the yard? | 16:50:08 |
| 24 | MS. GRUNFELD:  Objection.  Vague and | 16:50:15 |
| 25 | ambiguous.  Overbroad and compound. | 16:50:17 |

| | | |
|---|---|---|
| 1 | THE WITNESS:  At times, yes. | 16:50:22 |
| 2 | MS. RUDA:  Q.  Can you give me an estimate of | 16:50:24 |
| 3 | how many times? | 16:50:26 |
| 4 | A.   I have been allowed to leave early to go to | 16:50:33 |
| 5 | the yard? | 16:50:36 |
| 6 | Q.   Yes. | 16:50:38 |
| 7 | A.   Not many, but some ten times, more or less. | 16:50:44 |
| 8 | Q.   Okay.  I'm going to mark the next exhibit. | 16:50:49 |
| 9 | This is Exhibit 3. | 16:51:52 |
| 10 | [Whereupon, Deposition Exhibit 3, a | 16:51:52 |
| 11 | Payroll Discrepancy Report and payroll | 16:51:52 |
| 12 | records Bates stamped GBI-04558 and | 16:51:52 |
| 13 | PL0300 to PL0301 was marked for | 16:51:52 |
| 14 | identification.] | 16:51:59 |
| 15 | Please review and tell me when you're ready. | 16:51:59 |
| 16 | A.   (DOCUMENT REVIEW.) Yes. | 16:52:03 |
| 17 | Q.   Do you know what this document is? | 16:52:07 |
| 18 | A.   This is payroll, no? | 16:52:14 |
| 19 | Q.   Right.  Do you recall receiving a copy of this | 16:52:18 |
| 20 | form with your weekly paycheck? | 16:52:22 |
| 21 | A.   Yes. | 16:52:32 |
| 22 | MS. GRUNFELD:  Vague and ambiguous as to time. | 16:52:32 |
| 23 | MS. RUDA:  Q.  And the answer is what? | 16:52:37 |
| 24 | A.   Yes. | 16:52:39 |
| 25 | Q.   And do you recall receiving one of these | 16:52:42 |

| | | |
|---|---|---|
| 1 | Q.   Okay, so maybe it's my mistake, and I'm sorry. | 17:01:39 |
| 2 | What I wanted to know was; when you submitted this | 17:01:46 |
| 3 | discrepancy form, was there ever a time that you | 17:01:49 |
| 4 | submitted for additional hours on the discrepancy form | 17:01:58 |
| 5 | where you were then not paid for those additional hours | 17:02:09 |
| 6 | on a second check? | 17:02:12 |
| 7 | A.   No. | 17:02:18 |
| 8 | Q.   Thank you.  It was my mistake for | 17:02:19 |
| 9 | clarification.  Four. | 17:02:22 |
| 10 | [Whereupon, Deposition Exhibit 4, a | 17:02:22 |
| 11 | Collection of payroll discrepancy | 17:02:22 |
| 12 | reports was marked for identification.] | 17:03:49 |
| 13 | A.   (DOCUMENT REVIEW.) | 17:03:49 |
| 14 | Q.   Do you recognize the documents that I've | 17:04:12 |
| 15 | attached as Exhibit 4? | 17:04:16 |
| 16 | A.   Yes. | 17:04:21 |
| 17 | MS. GRUNFELD:   Object to "recognize" as vague | 17:04:21 |
| 18 | and ambiguous. | 17:04:23 |
| 19 | MS. RUDA:   Q.   Are these other discrepancy | 17:04:27 |
| 20 | forms that were submitted for you? | 17:04:30 |
| 21 | A.   Yes. | 17:04:35 |
| 22 | Q.   Did you ever submit a discrepancy form for | 17:04:38 |
| 23 | driving time? | 17:04:46 |
| 24 | A.   No. | 17:04:53 |
| 25 | Q.   Why not? | 17:05:00 |

| | | | |
|---|---|---|---|
| 1 | A. | Because they are not paid. | 17:05:03 |
| 2 | Q. | How did you know that? | 17:05:07 |
| 3 | A. | Because no one is paying for it.  That's what | 17:05:10 |
| 4 | I think. | | 17:05:15 |
| 5 | Q. | Did anybody ever tell you that? | 17:05:16 |
| 6 | A. | Several laborers who drive. | 17:05:21 |
| 7 | Q. | Did any foreman ever tell you that? | 17:05:28 |
| 8 | A. | That driving is not paid? | 17:05:35 |
| 9 | Q. | Yes. | 17:05:39 |
| 10 | A. | They must know.  They do not pay for it. | 17:05:42 |
| 11 | Q. | My question is; did anybody ever tell you | 17:05:46 |
| 12 | that? | | 17:05:49 |
| 13 | A. | No, because in 2007 they did pay.  They would | 17:05:56 |
| 14 | give you a separate check.  And all of a sudden, that | | 17:06:04 |
| 15 | was stopped. | | 17:06:09 |
| 16 | Q. | Did anybody ever tell you that you could not | 17:06:11 |
| 17 | submit a discrepancy form for driving time? | | 17:06:15 |
| 18 | A. | No. | 17:06:25 |
| 19 | Q. | Did you ever submit any discrepancy -- payroll | 17:06:27 |
| 20 | discrepancy form for a missed meal break? | | 17:06:32 |
| 21 | A. | I would do that the least. | 17:06:53 |
| 22 | Q. | So the answer is no? | 17:06:56 |
| 23 | A. | No.  No.  Excuse me. | 17:06:58 |
| 24 | Q. | Did you ever submit any discrepancy form for | 17:07:01 |
| 25 | missed rest breaks? | | 17:07:06 |

STATE OF CALIFORNIA        )

                           ) SS

COUNTY OF CONTRA COSTA  )

    I, ORA B. KOHN, Certified Shorthand

Reporter, do hereby certify:

    That prior to being examined, the witness in the

foregoing proceedings was by me duly sworn to testify

to the truth, the whole truth, and nothing but the

truth.

    That said proceedings were taken before me at

the time and place therein set forth and were taken

down by me in shorthand and thereafter transcribed into

typewriting under my direction and supervision.

    I further certify that I am neither counsel

for, nor related to, any parties to said proceedings,

nor in any way interested in the outcome thereof.

    In witness whereof, I have hereunto

subscribed my name.


    Dated: December 26, 2012


    ORA B. KOHN, CSR 11933


    (SIGNATURE NOT REQUESTED)

145

335c34ea-edf3-4154-a480-713f1e3dfe87

# EXHIBIT D

A60B7DE
LUIS GOMEZ      DECEMBER 19, 2012

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3

 4                       ---oOo---

 5

 6   JOSE RAMIREZ, LUIS GOMEZ, AND      )
     MARCK MENA ORTEGA ON BEHALF OF     )
 7   THEMSELVES AND ALL OTHER PERSONS   )
     SIMILARLY SITUATED                 )
 8                                      )
                     Plaintiffs,        )
 9                                      )
             vs.                        ) CASE: C12-04590 JSC
10                                      )
     GHILOTTI BROS, INC., A             )
11   CORPORATION; GHILOTTI BROTHERS     )
     CONSTRUCTION, INC., A              )
12   CORPORATION, AND DOES 1 THROUGH    )
     50, INCLUSIVE,                     )
13                                      )
                     Defendants.        )
14                                      )
                                        )
15

16

17         VIDEOTAPED DEPOSITION OF LUIS GOMEZ

18               SAN FRANCISCO, CALIFORNIA

19             WEDNESDAY, DECEMBER 19, 2012

20

21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   800.288.3376
     WWW.DEPO.COM
23

24   Reported By: Ora B. Kohn, CSR 11933

25   File No. A60B7DE
```

| | | |
|---|---|---|
| 1 | Q.   And the times that you went to Frank Pillagi | 14:33:41 |
| 2 | with a discrepancy, were you paid? | 14:33:47 |
| 3 | A.   Yes.  Frank would say if you worked, you're | 14:33:55 |
| 4 | going to get your money.  And that's where he would | 14:34:06 |
| 5 | check and call the foreman, and that's when I heard the | 14:34:11 |
| 6 | conversation that the foreman would be in agreement | 14:34:22 |
| 7 | that I worked that time.  And then he would sign, and | 14:34:24 |
| 8 | he would give it to the payroll lady. | 14:34:31 |
| 9 | Q.   Did you ever tell Mr. Pillagi that you had | 14:34:36 |
| 10 | missed meal breaks and that you had not been paid for | 14:34:45 |
| 11 | those missed meal breaks? | 14:34:56 |
| 12 | A.   No.  Just when I returned the form, it would | 14:35:01 |
| 13 | be for the hours that I was at the job site. | 14:35:12 |
| 14 | Q.   Did you ever tell Mr. Pillagi -- Pillagi | 14:35:15 |
| 15 | excuse me -- that you had missed rest breaks that you | 14:35:24 |
| 16 | had not been paid for? | 14:35:31 |
| 17 | A.   As I mentioned before, no. | 14:35:35 |
| 18 | Q.   Did you ever tell Mr. Pillagi that you were | 14:35:43 |
| 19 | being asked to drive and that you were not being | 14:35:46 |
| 20 | compensated for that time? | 14:35:52 |
| 21 | A.   Not to him, but on one occasion, it was for, | 14:36:01 |
| 22 | like, two or three months that we received checks for | 14:36:11 |
| 23 | driving, so it was a separate check.  But that just | 14:36:15 |
| 24 | lasted for two months or three. | 14:36:26 |
| 25 | Q.   Do you remember when that occurred? | 14:36:30 |

1        STATE OF CALIFORNIA        )

2                                   ) SS

3        COUNTY OF CONTRA COSTA    )

4        I, ORA B. KOHN, Certified Shorthand

5  Reporter, do hereby certify:

6        That prior to being examined, the witness in the

7  foregoing proceedings was by me duly sworn to testify

8  to the truth, the whole truth, and nothing but the

9  truth.

10        That said proceedings were taken before me at

11  the time and place therein set forth and were taken

12  down by me in shorthand and thereafter transcribed into

13  typewriting under my direction and supervision.

14        I further certify that I am neither counsel

15  for, nor related to, any parties to said proceedings,

16  nor in any way interested in the outcome thereof.

17             In witness whereof, I have hereunto

18  subscribed my name.

19

20        Dated: January 2, 2013

21

22

23        ORA B. KOHN, CSR 11933

24

25        (SIGNATURE REQUESTED)

154

bf1a8977-d2fa-4c39-b726-236342555277

# EXHIBIT E

 KCC

75 Rowland Way    415-798-5900 PHONE
Suite 250        415-892-7354 FAX
Novato, CA 94945   kccllc.com

February 25, 2013

Sean Gibbons, Esq.
Jeffer Mangels Butler & Mitchell LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    JMBM Collective-Action Notice
       Administration Services Estimate

Dear Sean,

We appreciate the opportunity to submit this proposal and cost estimate for administration services pertaining to your Collective-Action Notice.

For purposes of our proposal, we have assumed that we would mail a single-postcard Summary Notice to approximately 100 potential class members. KCC will process any filed Opt-Ins.

Our base administration services include data and forms management, the printing and mailing of notices to the potential class members, processing of returned undeliverable mail, processing all opt-ins filed and drafting a declaration pertaining to our notice procedures. In addition, we will provide live telephone support for the potential class members to call for more information about this lawsuit. Assuming no substantial increase in the number of potential class members to be noticed, we will charge a flat rate of $2,000 for these services.

With experience administering more than 1,500 settlements, KCC provides high-quality and cost-effective class action administration services including pre-settlement consulting, settlement funds escrow, class member data management, legal notification, call center support, claims administration as well as disbursement and tax reporting services. We are a knowledgeable partner who proactively works with you throughout the settlement administration process and are well-positioned to handle your matter immediately.

Our domestic infrastructure, the largest in the industry, includes a 900-seat call center and document production capabilities that handle hundreds of millions of documents annually. Last year, our disbursement services team distributed $250 billion to payees in the form of 29 million checks and 11 million electronic transfers.

Please contact me with any questions regarding the enclosed case assumptions and cost estimate. We will hold this proposal and estimate open for ninety days from the date of this letter. Thank you for your time and consideration.

Sincerely,

Patrick J. Ivie
VP, Class Action Services
Tel: 310.776.7385
Cell: 310.795.9742
pivie@kccllc.com